## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

U.S. COMMODITY FUTURES TRADING )
COMMISSION, )
                         )
              Plaintiff, )
                         )
       v. )     CIVIL ACTION NO.
                         )     4:13CV001900 RLW
DANIEL K. STEELE and CHAMPION )
MANAGEMENT INTERNATIONAL, LLC )
              Defendants, )
                         )
JUDY D. STEELE )
                         )
              Relief Defendant. )

## CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS DANIEL K. STEELE AND CHAMPION MANAGEMENT INTERNATIONAL, LLC AND RELIEF DEFENDANT JUDY D. STEELE

### I. INTRODUCTION

On September 25, 2013, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendants Daniel K. Steele ("Steele"), Champion Management International, LLC ("Champion Management") (collectively, "Defendants") and Judy D. Steele as a relief defendant ("Relief Defendant"), seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act")[1], 7 U.S.C. §§ 1 *et seq.* (2012), and the Commission's Regulations (" Commission Regulations") promulgated thereunder, 17 C.F.R. § 1.1 et seq. (2013). The Court entered an ex parte statutory restraining order against Defendants on

---

[1] In 2010 the Act was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (The Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376, 1641 et seq. (effective July 16, 2011).

September 25, 2013 ("SRO") and a Consent Order for Preliminary Injunction and for Other Equitable Relief on October 29, 2013. The CFTC filed an Amended Complaint on July 16, 2014.

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint and Amended Complaint against Defendants Steele and Champion Management and Relief Defendant Judy D. Steele without a trial on the merits or any further judicial proceedings, Defendants and Relief Defendant:

1.    Consent to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants Steele and Champion Management and Relief Defendant Judy D. Steele ("Consent Order");

2.    Affirm that Steele and the authorized representative of Champion Management has read and agrees to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledge service of the summons and Complaint;

4.    Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012);

5.    Admit the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1, *et seq.* (2012);

6.    Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e)(2012);

2

7.    Waive:

(a)    any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2013), relating to, or arising from, this action;

(b)    any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

(c)    any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)    any and all rights of appeal from this action;

8.    Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendants and/or Relief Defendant now or in the future reside outside the jurisdiction of this Court;

9.    Agree that they will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

10.    Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint, Amended Complaint, or the Findings of Fact or Conclusions of Law

in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendants and Relief Defendant shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

11.    By consenting to the entry of this Consent Order, neither admit nor deny the allegations in the Complaint, Amended Complaint, or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which they admit. Further, Defendants and Relief Defendant agree and intend that all of the allegations in the Complaint, Amended Complaint, and Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendants and/or Relief Defendant; (b) any proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a (2012), and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 *et seq.* (2013); and/or (c) any proceeding to enforce the terms of this Consent Order;

12.    Agree to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 137 of Section VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against any of them, whether inside or outside the United States; and

13.    Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants and/or Relief Defendant in any other proceeding.

4

### III.FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(2012), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A. FINDINGS OF FACT**

**1. The Parties to This Consent Order**

14. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

15. Defendant **Daniel Keith Steele** ("Steele") resides in Rolla, Missouri, and is the operator and authorized trader of the Steele Pools. During the relevant period, Steele has operated the Steele Pools and various related businesses from the same address located at 305 Greentree Road, Rolla, Missouri 65401. Steele has never been registered with the Commission in any capacity. Steele is not an Associated Person ("AP") of a financial institution, registered broker or dealer, insurance company, financial holding company, or investment bank holding company as defined by the Act.

16. Defendant **Champion Management International, LLC** ("Champion Management") is a Missouri Limited Liability Company organized on February 7, 2012. The business address for Champion Management is 305 Greentree Road, Rolla, Missouri 65401. Steele is the registered agent and managing member of Champion Management. Champion

5

Case: 4:13-cv-01900-RLW Doc. #: 68 Filed: 12/15/14 Page: 6 of 43 PageID #: 820

Management has never been registered with the Commission in any capacity. Champion Management is the purported general partner and commodity pool operator ("CPO") of another forex pool operated by Steele, Oracle Forex Fund, LP, also d/b/a Oracle Forex Fund ("OFF"). On or about February 27, 2012, Steele filed a notice of claim of exemption from registration as a CPO on behalf of Champion Management pursuant to Commission Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2013). Champion Management is not a financial institution, registered broker or dealer, insurance company, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act.

17.     Relief Defendant **Judy D. Steele** is married to Steele and resides in Rolla, Missouri. Judy D. Steele has unknowingly and indirectly received pool participants' funds to which she has no legitimate interest or entitlement.

**2. Other Relevant Entities**

18.     **Steele Management LLC, a.k.a. Steele Management Int. ("SM")**, is a "fictitious" name or d/b/a for Judy D. Steele created on October 9, 2012. During the relevant period, Steele operated SM as a commodity pool. The business address for SM is 305 Greentree Road, Rolla, Missouri 65401. SM has never been registered with the Commission in any capacity. SM is not a financial institution, registered broker or dealer, insurance company, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act.

19.     **Champion Management, a.k.a. Champion Management Int. ("CM")**, is a fictitious name or d/b/a for Judy D. Steele created on May 18, 2011. "Champion Management Int." is also a fictitious name, or d/b/a, for Judy D. Steele that was created on June 30, 2011. During the relevant period, Steele operated CM as a commodity pool. The business address for

6

CM is 305 Greentree Road, Rolla, Missouri 65401. CM has never been registered with the Commission in any capacity. On or about February 26, 2013, an exemption from registration as a CPO pursuant to Commission Regulation 4.13(a)(2) was filed on behalf of CM. Upon information and belief, CM has never solicited or accepted any pool participant funds or otherwise operated any commodity pool. CM is not a financial institution, registered broker or dealer, insurance company, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act.

20.     **Oracle Forex Fund, LP, also d/b/a Oracle Forex Fund ("OFF"),** is a Delaware Limited Partnership organized on February 7, 2012. OFF is also a fictitious name or d/b/a created on April 24, 2012 in the state of Missouri for which OFF is listed as the owner. During the relevant period, Steele, through Champion Management, operated OFF as a commodity pool. The business address for OFF is 305 Greentree Road, Rolla, Missouri 65401. OFF has never been registered with the Commission in any capacity. Champion Management is registered with the Commission as the CPO of OFF. OFF is not a financial institution, registered broker or dealer, insurance company, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act.

21.     **Champion Wealth Management, LLC ("CWM")** is a Missouri Limited Liability Company organized on January 21, 2013. Steele is the registered agent and principal of CWM. CWM has been registered with the Commission as a CPO since March 14, 2013. On March 8, 2013, Steele filed an application for registration with the Commission as an AP with CWM. Steele's application for registration as an AP of CWM has been pending since March 8, 2013. Upon information and belief, there is no evidence that CWM has ever solicited or accepted funds on behalf of any commodity pool, or that CWM operated any commodity pool.

7

22.   **SMI Income Fund** is a purported commodity pool operated by SM. On November 14, 2011, Steele filed a notice of claim of exemption from registration as a CPO on behalf of SM pursuant to Commission Regulation 4.13(a)(1). SMI Income Fund has never accepted any pool participant funds or otherwise operated as a commodity pool.

23.   **MIG Bank** ("MIG") is a forex brokerage firm headquartered in Lausanne, Switzerland. MIG is registered as an authorized bank and securities dealer with the Swiss Financial Market Supervisory Authority (FINMA). During the relevant period, defendants transferred pool participants' funds to accounts held in the name of Steele at MIG and used those funds to trade in leveraged, off-exchange foreign currency ("forex") transactions. MIG is not a United States financial institution, registered broker or dealer, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act. On or about December 9, 2013, MIG merged with Swissquote Bank SA and now operates under the name Swissquote.

### 3. Statutory and Regulatory Background

24.   On June 18, 2008, the Act was amended to incorporate new provisions pertaining to off-exchange retail forex transactions, including Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012). Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012), provides, in relevant part, that Section 4o of the Act, 7 U.S.C. § 6o (2012), applies to retail forex transactions.

25.   On October 18, 2010, the Commission adopted new regulations implementing certain provisions of the Act with respect to off-exchange retail forex transactions, including but not limited to, regulations requiring intermediaries such as CPOs and APs of CPOs to be registered as such.

8

*Applicability of Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A)-(B) (2012), to Forex CPOs*

26.   Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2012), states in relevant part that Section 4o of the Act, 7 U.S.C. § 6o (2012), applies to agreements, contracts, or transactions in forex described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i) (2012).

27.   Commission Regulation 5.25, 17 C.F.R. § 5.25 (2013), states in relevant part that Section 4o of the Act, 7 U.S.C. § 6o (2012), shall apply to retail forex transactions that are subject to the requirements of Part 5 of the Commission's Regulations as though Section 4o of the Act, 7 U.S.C. § 6o (2012), was set forth therein, and included specific reference to retail forex transactions and the persons defined in Commission Regulation 5.1, 17 C.F.R. § 5.1 (2013).

28.   Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6o(1)(A) and (B) (2012), make it unlawful for any CPO, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (A) to employ any device, scheme, or artifice to defraud any participant or prospective participant, or (B) to engage in any transaction, practice, or course of business which operates as a fraud or a deceit upon any actual or prospective pool participant.

*Applicability of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. 6(b)(a)(2)(A)-(C)(2012) and Commission Regulations 5.2(b)(1)-(3) and 5.25, 17 C.F.R. § 5.2(b)(1)-(3) and 5.25 (2013) to Forex CPOs*

29.   Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2012), states in relevant part that Section 4b of the Act, 7 U.S.C. § 6b (2012), applies to agreements, contracts, or transactions in forex described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(2012).

30.   Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv) further provides that Section 4b of the Act, 7 U.S.C. § 6b (2012) shall apply to any agreement, contract, or transaction

9

in foreign currency as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery.

31.     Commission Regulation 5.2(b)(1)-(3) makes it unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

<u>*Statutory and Regulatory Requirements Regarding Registration of Forex CPOs and APs*</u>

32.     Pursuant to Section 2(c)(2)(C)(iii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I) (2012), a person must be registered in such capacity as the Commission by rule, regulation, or order shall determine, to operate or solicit funds for any pooled investment vehicle that is not an eligible contract participant ("ECP") as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2012), in connection with off-exchange retail forex transactions.

33.     Pursuant to Commission Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2013), a CPO, for the purpose of forex transactions, is defined as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an [ECP] and that engages in retail forex transactions."

34.     As of July 16, 2011, the statutory definition of a CPO set forth in Section 1a(11) of the Act was amended by the Dodd-Frank Act to include CPOs operating commodity pools by soliciting and accepting funds for the purpose of trading forex, and to conform with the regulatory definition of a CPO set forth in Commission Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2013).

35.     Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2013), requires any person or entity acting as a CPO, as defined by Commission Regulation 5.1(d)(1), to be registered as such.

36.     Defendants have never been registered with the Commission in any capacity.

37.     Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2012), defines an ECP as a commodity pool that "(I) has total assets exceeding $5,000,000; and (II) is formed and operated by a person subject to regulation under [the] Act...[and] shall not include a commodity pool in which any participant is not otherwise an eligible contract participant."

38.     None of the Steele Pools qualify as an ECP because they were not formed and operated by a person who was either registered as a CPO or who possessed a valid exemption from being registered as such. In addition, none of the Steele Pools qualify as an ECP because no Steele Pool ever had total assets exceeding $5,000,000.

39.     Pursuant to Commission Regulation 5.1(d)(2), 17 C.F.R. § 5.1(d)(2) (2013), an AP of a CPO is defined as any natural person associated with a CPO, as defined in Commission Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2013), as a partner, officer, employee, consultant or agent who solicits funds on behalf of a CPO, or who supervises any person or persons so engaged.

40.     Commission Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2013), requires any person acting as an AP, as defined by Commission Regulation 5.1(d)(2), 17 C.F.R. § 5.1(d)(2) (2013), to be registered as such.

41.     Since at least February 7, 2012, Steele has acted as an AP for Champion Management while unlawfully failing to register as such.

11

*Regulations Relating to Reporting Requirements and Prohibited Activities for CPOs*

42.     Commission Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2013) requires that a CPO must operate its pool as an entity cognizable as a legal entity separate from that of the pool operator.

43.     During the relevant period, Steele operated the SM and CM pools without forming legally cognizable entities separate from that of the pool operator.

44.     Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2013) provides that no CPO may commingle the property of any pool that it operates or that it intends to operate with the property of any other person.

45.     During the relevant period, Steele commingled the property of one or more pool the operated or intended to operate with the property of another person.

46.     Commission Regulation 1.3(yy) (2013) defines "commodity interest" to include . any contract, agreement or transaction subject to Commission jurisdiction under Section 2(c)(2) of the Act, 7 U.S.C. § 2(c)(2) (2012).

47.     Commission Regulation 4.22, 17 C.F.R. § 4.22 (2013), requires every CPO registered or required to be registered under the Act to distribute periodic account statements to all pool participants, with each such account statement reporting and separately itemizing, in part: a) the total amount of realized net gain or loss on commodity interest positions liquidated during the reporting period, b) the change in unrealized gain or loss on commodity interest positions during the reporting period and c) the total amount of all management and advisory fees, and all other expenses incurred or accrued during the reporting period. Commission Regulation 4.22(h), 17 C.F.R. § 4.22(h) further requires that such periodic account statement contain an oath or affirmation, made by a representative duly authorized to bind the pool

12

operator, that to the best of the knowledge of the individual making the oath or affirmation, the information contained in the document is accurate and complete.

48. During the relevant period, Defendants, while acting as CPOs, did not provide pool participants with periodic account statements containing the information and oath or affirmation required by Regulation 4.22, 17 C.F.R. § 4.22 (2013).

### *Regulations Requiring Retail Foreign Exchange Dealers to be Registered*

49. Commission Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2013), defines a retail foreign exchange dealer ("RFED"), for purposes of Part 5 of the Commission's Regulations relating to off-exchange retail forex transactions, as "any person that is, or that offers to be, the counterparty to a retail forex transaction, except for a person described in sub-paragraph (aa), (bb), (cc)(AA), or (dd) of section 2(c)(2)(B)(i)(II) of the Act." These exceptions pertain to certain United States financial institutions, brokers, and dealers registered under the Securities Exchange Act of 1934 and associated persons thereof, futures commission merchants and affiliated persons thereof, financial holding companies, and investment bank holding companies.

50. Commission Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2013), requires any person acting as an RFED, as defined by Commission Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2013), to be registered as such.

51. MIG has never been registered with the Commission in any capacity. MIG is not a United States financial institution, registered broker or dealer, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act and accordingly does not qualify for any exception to the RFED registration requirement.

13

**4. Defendants' Forex Operation**

52.     During the relevant period, Steele solicited approximately $1.97 million from at least 24 pool participants located in Missouri and various other states within the United States to deposit funds in the Steele Pools for the purposes of trading forex on a leveraged or margined basis. Steele solicited at least some pool participants via email, and in connection with the operation of the Steele Pools, Steele made use of the mails or any other means or instrumentality of interstate commerce. Defendants' forex operation occurred in two phases.

*Phase I*

53.     During the first phase, from at least February 28, 2011, until February 1, 2012, Steele operated SM and CM as pooled investment vehicles in that he solicited and accepted funds from pool participants for the purported purpose of trading forex.

54.     At no time during this period, however, did Steele trade any forex on behalf of any pool participants or open any forex trading accounts in the name of SM or CM. Furthermore, Steele has never established SM or CM as separate legal entities.

55.     During this period, pool participants deposited funds into bank accounts held in the name of Judy D. Steele d/b/a SM and CM.

56.     During this period, instead of trading pool participants' funds, Steele utilized a portion of pool participants' funds for his personal benefit and commingled the pool participants' funds with personal funds and business-related funds.

57.     During this period, Steele knowingly issued or caused to be issued false account statements to pool participants or prospective pool participants that showed purported forex trading profits, and he knowingly made, or caused to be made, false statements reporting

14

profitable or successful forex trading in the Steele Pools. In fact, during this Phase I, Defendants had not yet begun to engage in any forex trading on behalf of the Steele Pools.

### Phase II

58.     During the second phase, beginning February 2, 2012, through at least September 25, 2013, Steele and Champion Management, through Steele, operated OFF as a commodity pool vehicle by soliciting and accepting pool participants' funds for the purpose of trading forex.

59.     During this period, pool participants deposited funds into bank accounts held in the name of OFF and Champion Management. Pool participants' funds were commingled with Steele's personal funds and business-related funds.

60.     During this period, Steele wired approximately $1.2 million of pool participants' funds to accounts held in his name and/or Judy Steele's name at MIG for the purpose of trading forex.

61.     Beginning in February 2012, Steele began to deposit some of the pool participants' funds into an account ending in **6956 at MIG that Steele opened and maintained in his name and that of his wife Judy D. Steele. Also beginning in February 2012, Steele began to enter into forex transactions in account **6956, and later in two additional sub-accounts, with MIG acting as the counterparty, or offering to be the counterparty, to such forex transactions.

62.     At all relevant times, Steele, acting individually and also, from February 7, 2012 through the present, as an agent of Champion Management, controlled and directed the forex trading in the MIG trading accounts.

63.     At all relevant times, Steele had both access to, and received regular updates from MIG on the status and value, either positive or negative, on all closed and open forex transactions in the MIG accounts controlled by Steele. Steele received this account information

15

in the form of daily account statements, month-end account statements, as well as through regular on-line access to MIG's trading platform.

64.    Beginning in March 2012, Steele began to accrue and to maintain open forex positions that had a negative month-end value that exceeded the positive value of any forex positions that Steele closed out during the month.

65.    For example, in March 2012, Steele closed out certain forex transactions in account **6956 that resulted in trading gains for those forex transactions of approximately $145,000. At the end of the same month, however, Steele left open other forex positions in the account that had an approximate month-end liquidating value (i.e., unrealized trading losses) of negative $415,000. As a result, the overall trading results in the account for the month of March 2012, factoring together both realized gains and losses and all month-end unrealized gains or losses, was approximately negative $270,000. Steele continued to close out certain forex transactions in account **6956 between April 2012 and June 2012 in such a manner that resulted in trading gains for the closed out transactions, while at the same time he left open other forex positions that had greater month-end unrealized losses each successive month, resulting each month in overall negative trading results.

66.    For example, in June 2012, Steele closed out certain forex transactions in account **6956 that resulted in trading gains for those transactions of approximately $4,400. At the same time, however, Steele left open other forex positions in the account that had a month-end net liquidating value (i.e. unrealized trading losses) of approximately negative $1,430,400.00. As a result, the overall trading results in the account for the month of May 2012, factoring together both realized gains and losses and any month-end unrealized gains or losses, was approximately negative $1,426,000.

16

67.     During the month of June 2012, while Steele had open unrealized forex trading losses of over $1.4 million in the MIG account, Steele and his family went on a week-long luxury cruise trip in Alaska. Steele used over $16,000 in misappropriated pool participant funds to pay for this trip.

68.     In July 2012, Steele closed out a large number of losing forex positions in account **6956, such that at the end of the month, Steele incurred realized trading losses in the account of approximately $1,380,000. During the same month, Steele left open other losing forex positions that had a month-end net liquidating value (i.e. unrealized trading losses) of negative $88,000. As a result, the overall trading results in the account for that month, factoring together both realized losses and any month-end unrealized losses, was approximately negative $1,468,000.

69.     Less than one week after Steele closed out a large number of losing forex transactions in the MIG account and incurred over $1.3 million in realized trading losses, he sent an email to at least one pool participant in which he stated that "with all that's gone on this year, I have been able to maintain a positive return for the fund just not the 20 to 30% I had last fall." Steele also attached false account statements to the email that showed purported pool trading profits for the months of September 2011 through June 2012, when in fact Steele knew or had to have known that there were either no trading results to report, or overall month-end negative trading results in the Steele Pools, for every month in 2012 in that period of time except February 2012.

70.     Steele closed out all remaining open forex transactions in account **6956 in the month of August 2012, resulting in realized trading losses, and overall trading results for the

17

month, of approximately negative $98,000. Steele did not conduct any forex transactions in account **6956 during the months of September 2012 or October 2012.

71.    In November 2012, Steele transferred $160,000 from MIG Bank forex trading account **6956 to open a second MIG Bank forex account ending in **9513 in the name of Steele and his wife, and he also separately transferred another $160,000 from MIG Bank forex trading account **6956 to open a third MIG Bank forex account ending in **9514, also in the name of Steele and his wife.

72.    Beginning in November 2012 and continuing until all remaining forex transactions in the MIG forex trading accounts were liquidated in October 2013, Steele continued to trade forex in the three MIG Bank accounts in a manner similar to his earlier forex trading, i.e. he selectively closed out certain forex transactions that resulted in trading gains as to those transactions, while at the same time, he left open at the end of the month other losing forex positions that had a larger negative value in the aggregate. Accordingly, when factoring in the value of both closed forex transactions and the month-end negative value of all open forex transactions for each successive month, Steele had overall net trading losses in the accounts in the aggregate.

73.    In February, March, April and May of 2013, Steele opened, but did not close out, any forex transactions in any of the three MIG accounts that resulted in either realized profits or realized losses for those months. During these same months, Steele left open losing forex positions in the accounts, with the approximate month-end negative liquidating value of all open forex positions being as follows:

February 2013: ($1,095,000);

March 2013: ($1,087,000);

18

April 2013: ($1,065,000); and

May 2013: ($1,052,000).

74.     Steele incurred over $700,000 in realized trading losses in one of the MIG accounts in June 2013, and he ultimately closed out all remaining forex transactions in the three MIG accounts in October 2013, resulting in additional net realized losses for that month for the three accounts combined of over $400,000. The final liquidated value of the three MIG accounts after all open trades were closed out in October 2013 was less than $60,000.

75.     When factoring in the results of all closed out forex trades in the three MIG accounts that Steele used to trade some of the pool participants' funds, Steele incurred over $600,000 in realized trading losses.

76.     During this period, Steele knowingly issued, or caused to be issued, false account statements to pool participants or prospective pool participants that showed purported forex trading profits, when in fact Steele knew, or had to be aware, that there were in fact no such forex trading profits, and that there was instead, during each of the periods of time referenced in the false account statements, overall negative trading results in the Steele Pools he operated.

77.     During the period, Steele knowingly made, or caused to be made, additional material misrepresentations to pool participants and prospective pool participants about the trading experience, track record, status and results of forex trading in the Steele Pools he operated, including, but not limited to the following statements:

(a) "we have seen tremendous growth and have accomplished great things as well as some amazing returns";

(b) "I'm up so much money this morning on trades placed February 24 & March 21 it would make your head spin…";

19

(c) "I've been doing this long enough to know what I can consistently deliver above expenses, in all market conditions...the return is fixed and is currently 5% per month on your invested amount compounded...";

(d) "Currently I am handling over $3 million including my own funds within the fund";

(e) "I have been able to maintain a positive return for the fund just not the 20[%] to 30% I had last fall";

(f) "I absolutely beyond a shadow of a doubt can produce the numbers required to sustain a fund at 10%...I have been trading and managing accounts long enough and have my system down so well that this is a minimum that I can produce month after month year after year....";

(g) "we have delivered 5% [monthly] return consistently to our clients for [the last] 4 months";

(h) "I have earned returns from a few % to over 30% per month";

(i) Less than one week after Steele received a July 2012 month-end statement from MIG that reflected he had incurred realized trading losses for that month of over $1.3 million, he sent an email to a prospective pool participant, in which he stated, in part: "What I can give you is net return after expenses.... The net return on the fund are as follows: Feb [2012]: 28.700%; Mar [2012]: 20.740%; Apr [2012]: 18.826%; May [2012]: 14.044%; Jun [2012]: 16.428%; Jul [2012]: 12.776%";

(j) "I believe we have reached a level of sustainable net profit that can be achieved in all market conditions and under whatever circumstances the company or myself may find ourselves in regardless";

(k) "As far as trading goes all is well";

20

(l) "Gross returns for August were 9.31%";

(m)"Your net profit [for 2012] is $3,074.89"; and

(n) "Regardless of the outcome [of the case filed by the Missouri Securities Division] your money is safe."

78.    In August 2013, one of the CM pool participants made repeated requests to Steele to provide the pool participant with copies of recent trading statements from MIG. Steele initially did not comply with this request, but ultimately Steele sent the pool participant an email stating, in part, "My best estimate is that I control close to 3 MM. Attached are the last statements." Steele continued in this email response to say, in part, "I don't have anything to hide... I was open and honest with you from the start."

79.    The purported MIG account statements that Steele attached to his August 21, 2013 email to the pool participant who requested them were not authentic copies of the actual MIG trading statements, but were instead forgeries. Steele had access to and knowledge of the true information about each account, and therefore Steele knowingly provided the forged account statements to the pool participant. While certain portions of each forged statement contained data or entries from the real MIG account statements, other portions of the forged account statements that Steele provided to the pool participant were materially altered. For example, the aggregate "equity" listed in the three forged account statements for the month of June 2013 was over $5.4 million, whereas the real aggregate equity balance in the three MIG Bank accounts combined that month was less than $155,000. Similarly, the aggregate "equity" listed in the three forged July 2013 MIG Bank trading statement that Steele provided to the pool participant was over $5.38 million, when the real aggregate equity in the three MIG Bank accounts combined for that month was less than $125,000.

21

### 5. Defendants' Material Omissions

<u>*Steele Failed to Disclose That He Misappropriated Pool Participants' Funds*</u>

80.     During the relevant period, Steele misappropriated a significant portion of the pool participants' funds by using funds for personal use and to pay business-related expenses for himself.

81.     Specifically, during the relevant period, Defendants received approximately $1.97 million from pool participants, which were deposited into bank accounts and/or trading accounts held in the name of Judy D. Steele d/b/a SM and CM, or Daniel Steele. Steele misappropriated approximately $1 million of pool participants' funds for personal use, including such expenses as: the purchase of a sports utility vehicle, an ocean cruise trip, car payments, groceries, home improvement supplies, and items at Wal-Mart and Amazon.com.

82.     During the relevant period, Judy D. Steele unknowingly and indirectly received approximately $180,000 of these misappropriated funds to which she had no legitimate business interest or entitlement.

83.     Steele failed to disclose to actual and prospective pool participants that he had misappropriated SM and CM pool participant funds.

<u>*Steele Failed to Establish SM and CM as Separate Legal Entities and Improperly Commingled Pool Participants' Funds*</u>

84.     Commission Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2013), provides that a CPO "must operate its pool as an entity cognizable as a legal entity separate from that of the pool operator."

85.     During the relevant period, Steele, while acting as a CPO for SM and CM, failed to establish SM or CM as separate legal entities. Instead, Steele caused pool participants to deposit funds into bank accounts held in the name of his wife Judy D. Steele d/b/a SM and CM.

86.     Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2013), prohibits a CPO from commingling the property of any pool that it operates with the property of any other person.

87.     During the relevant period, Steele, while acting as a CPO for SM and CM, commingled pool participants' funds with the personal and business-related funds. Specifically, SM and CM pool participants' funds were deposited into personal bank accounts held in the name of Judy D. Steele d/b/a SM and CM. In addition to using these bank accounts to deposit pool participants' funds, Steele also used these bank accounts for personal and business-related purposes without disclosing this to pool participants.

### Defendants Failed to Properly Registered with the Commission

88.     During the relevant period, Steele acted as a CPO for SM and CM in that he solicited and accepted funds from pool participants for the purpose of engaging in retail forex transactions on a leveraged or margined basis. Steele also acted as an AP for Champion Management in that he solicited funds as an agent for Champion Management, which is a CPO for OFF.

89.     Neither Steele nor Champion Management has ever been registered with the Commission in any capacity.

90.     On or about February 27, 2012, Steele filed a notice of claim of exemption from registration as a CPO on behalf of Champion Management pursuant to Commission Regulation 4.13(a)(2).

91.     Commission Regulation 4.13(a)(2) allows for an exemption from registration as a CPO for a commodity pool that has less than 15 participants and that the total amount it receives for "units of participation in all of the pools it operates or that it intends to operate do not in the aggregate exceed $400,000." 17 C.F.R. § 4.13(a)(2) (2013). However, neither Steele nor

23

Champion Management qualifies for this exemption because the Steele Pools' funds exceeded $400,000 in the aggregate.

92. Defendants also failed to amend this notice of the exemption through the NFA within 15 business days after the pool operator becomes aware of the occurrence of such event as required by Commission Regulation 4.13(b)(5), 17 C.F.R. § 4.13(b)(5) (2013).

93. Accordingly, during the relevant period, Defendants unlawfully failed to register with the Commission, failure to register with the Commission was material, and Defendants failed to disclose this material information to actual and/or prospective pool participants.

### *Defendants Failed to Disclose that MIG is not a Proper Counterparty*

94. During the second phase of Defendants' forex operation, Steele transferred or caused to be transferred approximately $1.2 million in pool participants' funds to three accounts held in his name at MIG for the purpose of trading forex.

95. During this period, MIG was acting as an RFED because MIG accepted pool participants' funds that Steele had caused to be deposited with MIG, and MIG offered to be, and/or was, the counterparty to all of Champion Management's forex transactions. Accordingly, MIG was either required to be registered as an RFED or required to qualify for an exemption from such registration.

96. MIG, however, has never been registered in any capacity with the Commission, nor is it one of the enumerated exempt entities including a United States financial institution, registered broker or dealer, financial holding company, or investment bank holding company or associated person of such entities as defined by the Act.

24

97. Defendants failed to disclose to pool participants that MIG, the counterparty to Champion Management's retail leveraged forex transactions, was not a proper counterparty to Champion Management's forex transactions. This information was material.

## B. CONCLUSIONS OF LAW

### 1. Jurisdiction and Venue

98. This Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

99. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, 7 U.S.C. § 13a-1(e), because the Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

### 2. Violation of Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) and Commission Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2013): Fraud in Connection with Forex Transactions (By Steele and Champion Management)

100. By the conduct described in paragraphs 1 through 97 above, Defendants in or in connection with off-exchange agreements, contracts or transactions in foreign currency that are leveraged or margined, made or to be made, for or on behalf of, or with, other persons, violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012), and Commission Regulations 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2013) by, among other things, knowingly, willfully or with reckless disregard for the truth: (1) misrepresenting the profitability of his

25

trading and the value of the Steele Pools; (2) issuing or causing to be issued false reports or false statements about the status or results of trading; and (3) misappropriating customers' and pool participants' funds.

101. From February 7, 2012 through the present, the foregoing misappropriation, fraudulent acts, misrepresentations and omissions of Defendant Steele occurred within the scope of his employment, office or agency with the Corporate Defendant Champion Management. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013), Champion Management is liable for Steele's violations of Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012), and Commission Regulations 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2013).

### 3. Violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012): Fraud by a Commodity Pool Operator (By Steele and Champion Management)

102. By the conduct described in paragraphs 1 through 97 above, Steele violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1)(B) (2012), in that he engaged in practices or a course of business which operated as a deceit upon actual and/or prospective pool participants by, among other things, (1) misrepresenting the profitability of his trading and the value of the Steele Pools; (2) issuing or causing to be issued false reports or false statements about the status or results of trading; (3) misappropriating customers' and pool participants' funds; (4) failing to disclose the material facts that Steele, while acting as a CPO for SM and CM, had unlawfully failed to register with the Commission as a CPO of either SM or CM; (5) failing to disclose the material fact that Steele, while acting as an AP of Champion Management, had unlawfully failed to register as an AP of Champion Management; (6) failing to disclose the material fact that Steele had commingled pool participants' funds with personal and business-related funds; (7) failing to disclose the material fact that SM and CM were not properly established as separate

26

legal entities as required by the Commission Regulations; (8) failing to disclose the material fact that Champion Management, while acting as a CPO, had unlawfully failed to register with the Commission as a CPO; and (9) failing to disclose the material fact that MIG was not a lawful counterparty to Champion Management's forex transactions.

103.    Since at least February 7, 2012, Steele committed the acts alleged above within the course and scope of his employment, office, or agency with Champion Management. Champion Management is therefore liable as a principal for Steele's violations of the Act and/or Commission Regulations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2013).

**4. Violation of Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2012) and Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2013): Failure to Register as a CPO (By Steele)**

104.    By the conduct described in paragraphs 1 through 97 above, Steele acted as a CPO, as defined by Commission Regulation 5.1(d)(1) relating to off-exchange forex transactions, because he operated or solicited funds for at least two pooled investment vehicles, SM and CM, that were not ECPs, as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2012), and engaged in retail forex transactions. Steele, however, unlawfully failed to register with the Commission as a CPO in violation of Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2012), and Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2013), and did not qualify for any exemption from such requirement.

**5. Violation of Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. 2(c)(2)(C)(iii)(I)(cc) (2012) and Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2013): Failure to Register as a CPO (By Champion Management)**

105.    By the conduct described in paragraphs 1 through 97 above, from at least February 7, 2012, Champion Management, through its agent Steele, acted as a CPO, as defined

by Commission Regulation 5.1(d)(1) relating to off-exchange forex transactions, because it operated or solicited funds for at least one pooled investment vehicle, OFF, that was not an ECP, as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2012), and engaged in retail forex transactions. Champion Management, however, failed to register with the Commission as a CPO in violation of Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2012), and Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2013), and did not qualify for any exemption from such requirement.

**6. Violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012) and Commission Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2013): Failure to Register as an AP (By Steele and Champion Management)**

106. By the conduct described in paragraphs 1 through 97 above, from at least February 7, 2012, Steele acted as an AP, as defined by Commission Regulation 5.1(d)(2) relating to off-exchange forex transactions, because he solicited funds for Champion Management, a registered CPO as defined in Section 1a of the Act. During this same period, Steele failed to register with the Commission as an AP in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012), and Commission Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2013).

107. Steele committed the acts alleged herein within the course and scope of his employment, office, or agency with Champion Management. Champion Management is therefore also liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2013), as a principal for Steele's violations of the Act and/or Commission Regulations.

28

**7. Violation of Commission Regulations 4.20(a)(1) and 5.4, 17 C.F.R. §§ 4.20(a)(1) and 5.4 (2013): Failure to Operate in the Name of the Pool (By Steele and Champion Management)**

108. By the conduct described in paragraphs 1 through 97 above, Steele violated Commission Regulations 4.20 (a)(1) and 5.4, 17 C.F.R. §§ 4.20(a)(1) and 5.4 (2013), by operating each of the pools, SM and CM, as a d/b/a for Judy D. Steele instead of legal entities separate from that of the pool operator.

109. From at least February 7, 2012 through the present, Steele, acting with the course and scope of his employment, office, or agency with Champion Management, further violated Commission Regulations 4.20 (a)(1) and 5.4, 17 C.F.R. §§ 4.20(a)(1) and 5.4 (2013), by operating the OFF pool in part through a MIG trading account opened and maintained in his name and the name of his wife, rather than in the name of OFF. Champion Management is therefore also liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2013), as a principal for Steele's violations of the Act and/or Commission Regulations.

**8. Violation of Commission Regulations 4.20(c) and 5.4, 17 C.F.R. §§ 4.20(c) and 5.4 (2013): Prohibition Against Commingling of Pool Participant Funds (By Steele and Champion Management)**

110. By the conduct described in paragraphs 1 through 97 above, Steele violated Commission Regulations 4.20(c) and 5.4 by commingling pool participants' funds with the property of others.

111. From at least February 7, 2012 through the present, Steele, acting with the course and scope of his employment, office, or agency with Champion Management, further violated Commission Regulations 4.20 (c) and 5.4 by commingling pool participants' funds with the property of others. Champion Management is therefore also liable pursuant to Section 2(a)(1)(B)

of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2013), as a principal for Steele's violations of the Act and/or Commission Regulations.

### 9. Violation of Commission Regulations 4.22(a)(1) and 5.4, 17 C.F.R. §§ 4.22(a) and 5.4 (2013): Failure to Distribute Required Account Statements (By Steele and Champion Management)

112. By the conduct described in paragraphs 1 through 97 above, Steele violated Commission Regulations 4.22(a)(1) and 5.4 by failing to issue periodic account statements to all participants that separately itemized the information specified in, and the oath or affirmation required by, the regulation.

113. From at least February 7, 2012 through the present, Steele, acting with the course and scope of his employment, office, or agency with Champion Management, further violated Commission Regulations 4.22(a)(1) and 5.4 by failing to issue periodic account statements to all participants that separately itemized the information specified in, and the oath or affirmation required by, the regulation. Champion Management is therefore also liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2.

### 10. Disgorgement of Funds from Relief Defendant (By Judy D. Steele)

114. By the conduct described in paragraphs 1 through 97 above, Defendants misappropriated a portion of pool participants' funds and engaged in unlawful conduct, and engaged in such as issuing false account statements and misrepresenting the status and results of forex trading, and further omitting material information that operated as a fraud or deceit upon pool participants, as alleged herein.

30

115.    Relief Defendant Judy D. Steele unknowingly and indirectly received funds as a result of Defendants' misappropriation of pool participants' funds, and she has been unjustly enriched thereby.

116.    Relief Defendant Judy D. Steele has no legitimate entitlement to or interest in the funds received as a result of Defendant's unlawful conduct and is required to disgorge funds up to the amount she received from Defendants' unlawful conduct, or the value of those funds that she may have subsequently transferred to third parties.

117.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Commission Regulations.

## IV. PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

118.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with Defendants, including successors thereof are permanently restrained, enjoined and prohibited from directly or indirectly:

> (a) in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market- (1) cheating or defrauding or attempting to cheat or defraud any person; (2) willfully making or causing to be made to any person any false report or statement or causing to be entered for any

31

person any false record; or (3) willfully deceiving or attempting to deceive any person by any means whatsoever in violation of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) and Commission Regulations 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2013);

(b) by use of the mails or any means or instrumentality of interstate commerce and while acting as a CPO as that term is defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012): (1) employing any device, scheme or artifice to defraud any client or participant or prospective client or participant; or (2) engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012); and

(c) violating Sections 2(c)(2)(C)(iii)(I)(aa) and 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(aa), 2(c)(2)(C)(iii)(I)(cc) (2012) and Commission Regulations 4.20(a)(1), 4.20(c), 4.22(a)(1), 5.2(b)(1)-(3), 5.3(a)(2)(i)-(ii), and 5.4, 17 C.F.R. §§ 4.20(a)(1), 4.20(c), 4.22(a)(1), 5.2(b)(1)-(3), 5.3(a)(2)(i)-(ii), and 5.4 (2013).

119. Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

(a) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

(b) Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures

products, swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. § 1a(47) (2012), and as further defined by Commission Regulation 1.3(xxx), 17 C.F.R. §1.3(xxx) (2013)), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (2012)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

(c) Having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

(d) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

(e) Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

(f) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and/or

(g) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. §3.1(a) (2013), an agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) registered, exempted from

registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

## V. RESTITUTION, DISGORGEMENT AND CIVIL MONETRARY PENALTY

### A. Restitution

120. Defendants Steele and Champion Management shall be jointly and severally liable to pay restitution in the amount of One Million Five Hundred Forty-Four Thousand Seven Hundred Twenty-Two Dollars and Eighty One Cents ($1,544,722.81) ("Restitution Obligation"), plus post-judgment interest, within thirty (30) days of the date of the entry of this Consent Order. Post-judgment interest shall accrue on the Restitution Obligation beginning on date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

121. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' pool participants the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

122. Defendants shall make Restitution Obligation payments under this Consent Order to the Monitor in the name of the "Steele Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding.

Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

123. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' pool participants identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part B below.

124. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents reasonably necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

125. Upon entry of this Consent Order, the SRO entered on September 25, 2013 shall terminate. Within ten (10) days of the entry of this Consent Order, any repository, bank, investment or other financial institution, wherever located, holding any of Defendants', Daniel K. Steele's and/or Champion Management International, LLC's, assets frozen pursuant to the

35

SRO shall be authorized and directed to release such assets to the Monitor in the name of the "Steele Restitution Fund" per the instructions described above in paragraph 122, including, but not limited to approximately Sixty-Five Thousand Two Hundred Ninety-Seven Dollars and Sixty-Two Cents ($65,297.62) in frozen assets held at Bank of America.

126. Defendants shall fully cooperate with any repository, bank, investment or other financial institution by executing any documents reasonably necessary to release and/or transfer any assets to the Monitor. Any funds transferred to the Monitor pursuant to paragraph 125 shall be a credit towards Defendants' Restitution Obligation.

127. The Monitor shall provide the Commission and the Defendants at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

128. The amounts payable to each pool participant shall not limit the ability of any pool participant from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

129. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued

36

compliance with any provision of this Consent Order and to hold Defendants in contempt for any violations of this Consent Order.

130.  To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B. Civil Monetary Penalty**

131.  Defendants shall jointly and severally be liable to pay a civil monetary penalty in the amount of One Million Dollars ($1,000,000) ("CMP Obligation"), plus post-judgment interest, within thirty (30) days of the date of the entry of this Consent Order. Post-judgment interest shall accrue on the CMP Obligation beginning thirty (30) days after the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2006).

132.  Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables – AMZ 340
> E-mail Box 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter

that identifies the paying Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C. Disgorgement**

133.   Relief Defendant Judy D. Steele shall pay disgorgement in the amount of One Hundred Eighty Seven Thousand Eighty Three Dollars and Fifty Eight Cents ($187,083.58)("Disgorgement Obligation"), plus post-judgment interest, within thirty (30) days of the date of the entry of this Consent Order. Post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2006).

134.   Relief Defendant Judy D. Steele shall pay her Disgorgement Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables – AMZ 340
> E-mail Box 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment by electronic funds transfer is chosen, Relief Defendant shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with

those instructions, Relief Defendant shall accompany payment of the Disgorgement Obligation with a cover letter that identifies the Relief Defendant and the name and docket number of this proceeding. Relief Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**D. Provisions Related to Monetary Sanctions**

135.    Partial Satisfaction: Any acceptance by the Commission or the Monitor of partial payment of Defendants' Restitution Obligation or CMP Obligation, or Relief Defendant's Disgorgement Obligation, shall not be deemed a waiver of Defendants' or Relief Defendant's obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

136.    Any partial payment that Relief Defendant Judy D. Steele makes towards her Disgorgement Obligation shall reduce and offset, on a dollar-by-dollar basis, the Restitution Obligation owed by Defendants Daniel Steele and Champion Management. Any payments in excess of One Million Three Hundred Fifty Seven Thousand Six Hundred Thirty Nine Dollars and Fifty Eight Cents ($1,357,639.58) made by Defendants Daniel K. Steele or Champion Management towards their joint Restitution Obligation shall reduce and offset, on a dollar-by-dollar basis, the Disgorgement Obligation owed by Relief Defendant Judy Steele.

## VI. MISCELLANEOUS PROVISIONS

137.    Notice: All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows: Notice to Commission:

Notice to Commission:

        Paul Hayeck, Esq.
        Deputy Director

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W., Sixth Floor
Washington, D.C.

Notice to Defendants and Relief Defendant:

David B. Cosgrove, Esq.
Cosgrove Law Group, LLC
8021 Forsyth Blvd.
St. Louis, Missouri 63105
Attorneys for Defendants and Relief Defendant

All such notices to the Commission shall reference the name and docket number of this action.

138.    Change of Address/Phone: Until such time as Defendants and Relief Defendant satisfy in full their Restitution Obligation, Disgorgement Obligation and CMP Obligation as set forth in this Consent Order, Defendants and Relief Defendant shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

139.    Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. This Consent Order supersedes the terms and agreements set forth in the Preliminary Consent Order entered in this matter. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

140.    Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

40

141.  Waiver: The failure of any party to this Consent Order or of any pool participant at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or pool participant at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

142.  Acknowledgements: Upon being served with copies of this Consent Order after entry by the Court, Defendants and Relief Defendant shall sign acknowledgements of such service and serve such acknowledgements on the Court and the Commission within ten (10) calendar days.

143.  Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

144.  Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendants and Relief Defendant, upon any person under their authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants or Relief Defendant.

145.  Authority: Steele hereby warrants that he is the registered agent and managing member of Champion Management and that this Consent Order has been duly authorized by

41

Champion Management and he has been duly empowered to sign and submit this Consent Order on behalf of Champion Management.

146.  Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

147.  Defendants and Relief Defendant understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants Daniel K. Steele and Champion Management International, LLC and Relief Defendant Judy D. Steele.*

IT IS SO ORDERED on this 5th day of December , 2014

Ronnie L. White

HONORABLE RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE

CONSENTED TO AND APPROVED BY:

Daniel Keith Steele

Defendant Daniel K. Steele
305 Greentree Road
Rolla, MO 65401
Telephone: (573) 578-3093

42

Date: _Sept 24, 2014_

_Daniel K. Steele_

Defendant Champion Management
International, LLC by Daniel K. Steele
305 Greentree Road
Rolla, MO 65401
Telephone: (573) 578-3093

Date: _Sept. 24/2014_

_Judy D. Steele_

Relief Defendant Judy D. Steele
305 Greentree Road
Rolla, MO 65401
Telephone: (573) 578-3093

Date: _9/24/14_

Approved as to form:

David B. Cosgrove, Esq.
Missouri Bar # 40980
Cosgrove Law Group, LLC
8021 Forsyth Boulevard
St. Louis, Missouri 63105
Email: dscosgrove@cosgrovelawllc.com
Attorneys for Defendants and Relief
Defendant

Date: _10/22/14_

_Eugene Smith_

Eugene Smith (esmith@cftc.gov)
Eastern District of Missouri Bar #499214DC
Melanie Devoe (mdevoe@cftc.gov)
Eastern District of Missouri Bar #73058MD
Peter M. Haas (phaas@cftc.gov)
Eastern District of Missouri Bar #358333DC
Division of Enforcement
U.S. Commodity Futures Trading
Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5371 (Smith)
Facsimile: (202) 418-5124
ATTORNEYS FOR PLAINTIFF
U.S. COMMODITY FUTURES TRADING
COMMISSION

Date: 12/9/14

43